1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF WASHINGTON
9

10   EQUAL EMPLOYMENT OPPORTUNITY
     COMMISSION,
11
                     Plaintiff,          NO. CV-06-3075-EFS
12
     ANGELA HARPER
13                                       **ORDER ENTERING THE COURT'S**
          Plaintiff-Intervenor,          **RULINGS FROM JULY 25, 2008**
14                                       **HEARING**
               v.
15
     STARLIGHT, LLC,
16
                     Defendant.
17

18        A hearing occurred in the above-captioned matter on April 23, 2008.

19   Teri  L.  Healy  appeared  on  behalf  of  Plaintiff  Equal  Employment

20   Opportunity Commission ("EEOC"); James E. Davis appeared on behalf of

21   Plaintiff-Intervenor Angela Harper;[1] and Gary E. Lofland appeared on

22   behalf of Defendant Starlight LLC.    Before the Court was Defendant's

23   Motion for Summary Judgment.   (Ct. Rec. 25.)   After reviewing the

24

25        [1]For ease, Plaintiff EEOC and Plaintiff-Intervenor Ms. Harper will

26   collectively be referred to as "Plaintiff."

     ORDER ~ 1

submitted material, relevant authority, and hearing oral argument, the Court was fully informed and denied Defendant's motion.   This Order serves to memorialize and supplement the Court's oral rulings.

## I. Background[2]

Defendant operates a restaurant and bar that employs approximately forty (40) employees in Ellensburg, Washington.  (Ct. Rec. 50 at 1-2.)  Plaintiff is an African American Muslim born on May 9, 1984.  *Id.* at 2. As part of her religion, Plaintiff wears a scarf on her head (hijab) for modesty.  *Id.*  Plaintiff began working for Defendant on May 20, 2004, as a dishwasher - she was twenty years old.  *Id.*

Shortly after starting, Plaintiff asked Carly Goodin, Defendant's dining room manager, if she could work as a waitress.  *Id.*  Ms. Goodin agreed, and Plaintiff picked up lunch and weekend breakfast waitress shifts - these shifts are the least lucrative shifts.  (Ct. Recs. 43 at 6; 50 at 2.)  In June 2004, Jolene Hunter replaced Ms. Goodin as dining room manager.  (Ct. Rec. 50 at 2.)

Doris Morgan is Defendant's sole member and general manager. Sometime early in Plaintiff's employ, Ms. Morgan asked her, "[s]o what's the deal with the thing on your head?"  *Id.* at 3.   After Plaintiff explained the hijab's purpose, Ms. Morgan asked if Plaintiff could "wear a fancier headdress" because she did not "understand the whole Muslim faith."  *Id.*

---

[2]In a motion for summary judgment, the facts are set forth in a light most favorable to the nonmoving party - here, that is Plaintiff. *Leslie v. Grupo ICA,* 198 F.3d 1152, 1158 (9th Cir. 1999).

ORDER ~ 2

1    In the winter of 2004, Plaintiff asked Ms. Hunter to assign her as
2  a waitress during the dinner shift or as a cocktail waitress - these
3  shifts are the most lucrative shifts. (Ct. Recs. 43 at 6; 50 at 3.)  No
4  positions were available.  Ms. Hunter provided Plaintiff a drink menu and
5  told her to study it, advising her that a position would be available
6  when she returned from vacation in the summer of 2005.

7    Plaintiff started to work one (1) to two (2) dinner shifts per week,
8  but only because she covered other employees (shifting schedules were
9  common because Defendant primarily employed college students).
10  (Ct. Rec. 50 at 3.)  Between 2004 and 2005, Defendant hired eight (8)
11  individuals to fill dinner and cocktail shifts. (Ct. Rec. 43 at 6.)  All
12  were white.  *Id.*  In March 2005, Plaintiff expressed her frustration to
13  Ms. Morgan that others were being hired to work dinner and cocktail
14  shifts even though she had worked hard and had been there longer.  *Id.*

15    Ms. Morgan regularly held meetings with managers to discuss business
16  and employee performance. (Ct. Rec. 50 at 6.)  During a regular meeting
17  on August 2, 2005, Ms. Hunter, the manager who directly supervised
18  Plaintiff, stated that it was unfair to keep Plaintiff on the lunch shift
19  because she was a fine, dedicated waitress who was "ready to move up" and
20  work dinner shifts. (Ct. Rec. 42-6 at 77.)  Ms. Morgan disagreed.  Her
21  resistance was unusual considering she did not directly supervise
22  Plaintiff and spent most of her time upstairs working on the books.
23  (Ct. Rec. 43 at 7.)

24    When asked to explain her resistance, Ms. Morgan insisted that the
25  kitchen staff complained about Plaintiff and, more importantly, that she
26  appeared to be "frazzled" and lacking the calm needed for the dinner

shift.   (Ct. Rec. 50 at 4.)   Ms. Hunter responded that appearing
"frazzled" is not out of character during the lunch shift because it is
understaffed - one employee covers several tables.   (Ct. Rec. 42-
6 at 78.)

Ms. Hunter then suggested that Plaintiff work as a cocktail server
because it is faster paced and "may work better for her personality."
*Id.* at 79.   Ms. Morgan disagreed again, stating that she did not want
Plaintiff "cocktailing out there."  (Ct. Rec. 42-6 at 79.)   When asked
why, Ms. Morgan answered that she wants "really gorgeous girls to
cocktail."  (Ct. Rec. 50 at 4.)

Ms. Morgan's explanation confused Ms. Hunter considering Plaintiff
was constantly complemented on being gorgeous and exotic.   *Id.*   When
pressed, she clarified, "[w]ell, what I meant is I want hot white girls,
like Emily."  *Id.* at 4.   Ms. Morgan insisted that she is not a bigot;
rather, she does not think that "the head dress and her being
Muslim . . . [is] what we want in the bar."  (Ct. Rec. 42-6 at 80.)

Plaintiff was vacationing in Florida when these comments were made.
(Ct. Rec. 50 at 5.)   After returning and learning about the comments,
Plaintiff confronted Ms. Morgan on August 15, 2005.   Ms. Morgan told
Plaintiff "it's not - it wasn't about your race it was more about your
scarf thing . . . . [Y]ou know how people in Ellensburg are? They're not
gonna want to see, you know, a girl like that on the cocktailing shift
. . . . [I]t was a business decision, it was nothing against you."
(Ct. Rec. 42-4 at 28.)

Ms. Morgan proceeded to offer Plaintiff a position as a cocktail
server.  (Ct. Rec. 50 at 5.)   Plaintiff construed the offer as insincere,

ORDER ~ 4

1  declined it, and resigned that same day.  (Ct. Rec. 43 at 9.)  After the

2  conversation, Ms. Morgan returned to her office in a near frantic state.

3  *Id.*  She paced around the office stating that she could not have said

4  that, that she needed to call her attorney, and that this could get her

5  in trouble.  *Id.*

6      Plaintiff sought alternative employment at several different

7  restaurants - none were hiring.  *Id.* at 6.  In mid-November 2005,

8  Plaintiff discovered she was pregnant.  *Id.*  After talking with her

9  husband, Plaintiff decided not to seek alternative employment and instead

10  become a "stay-at-home mom."  *Id.*

11                            **II. Discussion**

12  **A. Summary Judgment Standard**

13      Summary judgment is appropriate if the "pleadings, depositions,

14  answers to interrogatories, and admissions on file, together with the

15  affidavits, if any, show that there is no genuine issue as to any

16  material fact and that the moving party is entitled to judgment as a

17  matter of law."  FED. R. CIV. P. 56(c).  Once a party has moved for

18  summary judgment, the opposing party must point to specific facts

19  establishing that there is a genuine issue for trial.  *Celotex Corp. v.*

20  *Catrett,* 477 U.S. 317, 324 (1986).  If the nonmoving party fails to make

21  such a showing for any of the elements essential to its case for which

22  it bears the burden of proof, the trial court should grant the summary

23  judgment motion.  *Id.* at 322.  "When the moving party has carried its

24  burden of [showing that it is entitled to judgment as a matter of law],

25  its opponent must do more than show that there is some metaphysical doubt

26  as to material facts.  In the language of [Rule 56], the nonmoving party

must come forward with 'specific facts showing that there is a *genuine issue for trial.'"* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (citations omitted) (emphasis in original opinion).

When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). This does not mean that a court will accept as true assertions made by the non-moving party that are flatly contradicted by the record. *See Scott v. Harris,* 127 S. Ct. 1769, 1776 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

The Ninth Circuit sets a high standard for granting summary judgment in employment discrimination cases because "the ultimate question is one that only be resolve through a 'searching inquiry' - one that is most appropriately conducted by the factfinder, upon a full record." *Schnidrig v. Columbia Mach.,* 80 F.3d 1406, 1410 (9th Cir. 1996)

**B. Title VII Discrimination Claims**

Title VII makes it an unlawful employment practice "to discriminate against . . . any individual because of [her] race, color, [or] religion . . . ." 42 U.S.C. 2000e-2(b). The Supreme Court articulated two (2) employment discrimination theories: the first is disparate treatment, the second is disparate impact. *Hazen Paper Co. v. Biggins,* 507 U.S. 604,

1  609 (1993).   Here, Plaintiff's claim is based on disparate treatment,

2  which occurs when an employer treats an employee less favorably because

3  of her membership in a protected class.   *Int'l Bhd. of Teamsters v.*

4  *United States,* 431 U.S. 324, 335-36 n.15 (1977).

5      Defendant argues that Plaintiff's Title VII claim fails under the

6  *McDonnell Douglas* burden-shifting analysis[3] because there is no evidence

7  that any inappropriate statements about race or religion were made during

8  her employ. (Ct. Rec. 26 at 6.)  Defendant's reliance on the  *McDonnell*

9  *Douglas* burden-shifting analysis is misplaced because discrimination

10 claims can survive summary judgment based on direct evidence alone.   *See*

11 *Enlow v. Salem-Keizer Yellow Cab Co.,* 389 F.3d 802, 812 (9th Cir. 2004).

12 The *McDonnell Douglas* burden-shifting analysis is actually reserved for

13 scenarios where there is no direct discrimination evidence and a

14 plaintiff must rely on circumstantial evidence to prove discrimination.

15 *See AARP v. Farmers Group, Inc.,* 943 F.2d 996, 1000 n.7 (9th Cir. 1991).

16 The proper procedure, therefore, is to determine if direct discrimination

17 evidence exists and, if not, then proceed under the burden-shifting

18 analysis.

19      "Direct evidence is evidence which, if believed, proves the fact [of

20 discriminatory animus] without inference or presumption." *Godwin v. Hunt*

21 *Wesson, Inc.,* 150 F.3d 1217, 1221 (9th Cir. 1998) (citations omitted);

22 *see also Enlow,* 389 F.3d 812 (noting that, in the context of an ADEA

23 claim, direct evidence is "evidence of conduct or statements by persons

24 involved in the decision-making process that may be viewed as directly

25 

26      [3]*See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

ORDER ~ 7

1   reflecting the allegedly discriminatory attitude . . . sufficient to
2   permit the fact finder to infer that the attitude was more likely than
3   not a motivating factor in the employer's decision.")  When a plaintiff
4   offers direct evidence of discriminatory motive, a triable issue as to
5   the employer's actual motivation is created even if the evidence is not
6   substantial.  *Godwin,* 150 F.3d at 1221.

7       Viewing the evidence in Plaintiff's favor, Plaintiff presents
8   sufficient direct discrimination evidence to preclude summary judgment.
9   Plaintiff sought a promotion from the lunch and weekend breakfast shifts
10  to the dinner and cocktail shifts.  Even though Plaintiff's direct
11  supervisor viewed her as qualified, Ms. Morgan rejected the shift switch,
12  indicating that she preferred to have "hot white girls, like Emily."  Ms.
13  Morgan went on to explain that "the head dress and her being Muslim . . .
14  [is] not what we want in the bar."  (Ct. Rec. 42-6 at 80.)  True, these
15  comments were not made in Plaintiff's presence, but Plaintiff heard about
16  the comments.  When confronted by Plaintiff, Ms. Morgan stated that "it
17  wasn't about your race it was more about your scarf thing . . . . [Y]ou
18  know how people in Ellensburg are?  They're not gonna [sic] want to see,
19  you know, a girl like that on the cocktailing shift . . . . [I]t was a
20  business decision, it was nothing against you."  (Ct. Rec. 42-4 at 28.)

21      A jury could conclude that Ms. Morgan's alleged statements, if
22  believed, prove discriminatory animus without inference or presumption.
23  *See Godwin,* 150 F.3d at 1221.  This evidence is more than sufficient to
24  meet Ninth Circuit standards for surviving summary judgment.  *See, e.g.,*
25  *Lindahl v. Air France,* 930 F.2d 1434 (9th Cir. 1991) (direct evidence of
26  sexual stereotyping where employer believed that the female candidates

ORDER ~ 8

get "nervous" and "easily upset"); *Cordova v. State Farm Ins. Cos.,* 124 F.3d 1145 (9th Cir. 1997) (direct evidence of race discrimination where employer referred to a Mexican-American employee as a "dumb Mexican"); *Sischo-Nownejad v. Mered Cmty. Coll. Dist.*, 934 F.2d 1104 (9th Cir. 1991) (direct evidence of age and gender bias where employee referred to female plaintiff as "an old warhorse" and to her students as "little old ladies.")    Accordingly, summary judgment on this issue is not appropriate.[4]

## C. Constructive Discharge

Defendant next argues that Plaintiff's constructive discharge claim fails because her working conditions were not objectively intolerable and she quit without attempting to resolve her differences with Ms. Morgan. (Ct. Rec. 26 at 10.)  Plaintiff counters that there are genuine factual issues as to whether her resignation was reasonable under the circumstances.  (Ct. Rec. 40 at 17.)

"[C]onstructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Brooks v. City of San Mateo,* 229 F.3d 917, 930 (9th Cir. 2000); *see also Watson v. Nationwide Ins., Co.,* 823 F.2d 360 (9th Cir. 1987) (noting that

---

[4]Because there is sufficient direct discrimination evidence to preclude summary judgment, the Court need not engage in the *McDonnell Douglas* burden-shifting analysis.

ORDER ~ 9

constructive discharge is found where a working environment is so intolerable and discriminatory as to justify a reasonable employee's decision to leave). This test is objective; the plaintiff need not show that the employer subjectively intended to force the employee to resign. *Satterwhite v. Smith,* 744 F.2d 1380, 1383 (9th Cir. 1984). "As a result, the answer turns on the facts of each case." *Id.* at 1382.

Generally, a single isolated instance of employment discrimination is insufficient as a matter of law to support a constructive discharge finding. *Nolan v. Cleland,* 686 F.3d 806, 813 (9th Cir. 1982). The Ninth Circuit requires more - specifically, "aggravating factors" that demonstrate a continuous pattern of discriminatory treatment over months or years. *Watson,* 823 F.2d at 361; *see also Nolan,* 686 F.2d at 813-14 (finding four differential treatment incidents over a two-year period created a genuine factual issue for the jury).

This "high standard" is predicated on the notion that Title VII policies are best served when parties attack discrimination within the context of their existing employment relationship, rather than when the employee walks away and then later litigates whether [her] employment was intolerable." *Watson,* 823 F.2d at 361.

For the reasons articulated on the record, while the question is close, a reasonable fact finder could conclude that Plaintiff was driven from the workplace. The Ninth Circuit's decision in *Satterwhite* is instructive. In *Satterwhite,* the plaintiff, who was black, worked as a "casual sweeper" for the Port of Tacoma. 744 F.2d at 1381. Casual sweepers fill in when permanent employees are absent. *Id.* When hired, the Port informed the plaintiff that he would get a permanent position

1   when available.  This did not occur.  Instead, plaintiff continued to
2   work as a casual sweeper even though the Port regularly promoted white
3   men.  *Id.*  Sometimes the plaintiff had to train these men.  *Id.* at 1383.
4   The Port's reason for denying the plaintiff a promotion - that he lacked
5   railroad experience - turned out to be pretext for discriminating against
6   him because he was black.  *Id.*  The plaintiff's supervisor relegated him
7   to working in "the rope room," a dull job that left him with virtually
8   no hope for career advancement.  The Ninth Circuit concluded that the
9   district court, when faced with these facts, did not err in concluding
10  that the plaintiff's employment conditions were intolerable and
11  discriminatory.  *Id.*

12      The facts here are similar.  Plaintiff worked the lunch and weekend
13  breakfast shifts, occasionally assisting with the more lucrative dinner
14  and cocktail shifts when other employees were absent.  Plaintiff asked
15  Ms. Hunter - several times over several months - to be switched
16  permanently to the dinner and cocktail shifts.  Allegedly there were no
17  openings.  During this time, however, Ms. Morgan hired five (5)
18  individuals to fill dinner and cocktail shifts.  All were white.  Much
19  to Plaintiff's displeasure, she had to train a few of these women for the
20  position she sought.  Viewing the evidence in Plaintiff's favor,
21  Defendant's stated reason for keeping Plaintiff on the lunch shift - that
22  she was too "frazzled" to work on the dinner shift - could be considered
23  mere pretext for discriminating against her because she was an African
24  American Muslim.  When pressed about her reasoning, Ms. Morgan stated
25  that she'd prefer "really gorgeous girls to cocktail" - gorgeous *white*
26  girls.

Title VII contemplates parties "attacking discrimination" within the employment relationship instead of aggrieved employees walking away and later litigating whether their work environment was tolerable. *Watson,* 823 F.2d at 361.  Plaintiff did so.  After learning about Ms. Morgan's comments, Plaintiff confronted her directly.  Plaintiff hoped Ms. Morgan would sit down with her "and get this all cleared up." (Ct. Rec. 42-4 at 33.)  That did not happen.  Instead, Ms. Morgan justified her comments and actions, calling them "business decisions" driven by Ellensburg's demographics, telling Plaintiff, "it's not - it wasn't about your race it was more about your scarf thing . . . . [Y]ou know how people in Ellensburg are?  They're not gonna want to see, you know, a girl like that on the cocktailing shift . . . ." (Ct. Rec. 42-4 at 28.)

This case also does not involve a "single isolated instance" of employment discrimination. *Watson,* 823 F.2d 361.  Discrimination began when, early on in Plaintiff's employment, Ms. Morgan asked, "[s]o what's the deal with the thing on your head?" (referring to Plaintiff's hijab); it was evident when Plaintiff was passed over for promotion to the dinner and cocktail shifts on five (5) occasions;[5] it existed when Ms. Morgan revealed her preference for hiring "hot white girls" to work the dinner and cocktail shifts; and it was apparent when Ms. Morgan informed

---

[5]Although Plaintiff's Statement of Material Facts (Ct. Rec. 43) indicates that eight (8) women were hired to fill dinner and cocktail shifts between 2004 and 2005, only five (5) positions were filled from January 2005 on - when Plaintiff expressed interest in transferring to the dinner and cocktail shifts.

ORDER ~ 12

Plaintiff that the people of Ellensberg were not ready to see "a girl like [her]" on the cocktailing shift.

True, Ms. Morgan did offer Plaintiff a cocktailing position on August 15, 2008, after her confrontation. But viewing the evidence in Plaintiff's favor, Ms. Morgan's after-the-fact promotion offer was disingenuous, a mere Potemkin village designed to mask Ms. Morgan's disparaging comments and appearance of impropriety.

Moreover, in a small work environment where Ms. Morgan remains a supervisor, a reasonable employee in Plaintiff's position, like the plaintiff in *Satterwhite,* could feel trapped in an intolerable environment and compelled to leave. This is a question for the jury. *See Watson,* 823 F.2d at 361 (acknowledging that whether conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question for the jury).

**D. Wages**

Defendant argues that Plaintiff is not entitled to lost wages because she voluntarily left employment on August 15, 2005; Defendant alternatively argues that Plaintiff is not entitled to back pay after November 15, 2005 - the day Plaintiff discovered she was pregnant - because she voluntarily withdrew from the labor market and decided to become a "stay-at-home mom." (Ct. Rec. 26 at 11.) Plaintiff's response is two-fold: (1) Defendant does not meet its burden of demonstrating that there were suitable positions available; and (2) Plaintiff only decided to start a family after she could not find alternative employment. (Ct. Rec. 40 at 20.)

1    For the reasons articulated on the record, the Court finds that

2  Plaintiff's lost wages and back pay claims are questions for the jury.

3  The Court alternatively finds that Defendant did not meet its burden of

4  demonstrating that Plaintiff failed to mitigate her damages.

5    Employees who are victims of discriminatory conduct are generally

6  entitled to back pay provided the employee fulfills her statutory duty

7  to mitigate damages. *See Thorne v. City of El Segundo,* 802 F.2d 1131,

8  1133-34 (9th Cir. 1986); *Sias v. City Demonstration Agency,* 588 F.2d 692,

9  696 (9th Cir. 1978).

10    To prevail on a claim for failure to mitigate damages, defendants

11 must show that, based on the undisputed facts in the record, (1) there

12 were substantially equivalent jobs available during the time in question

13 that the plaintiff could have obtained, and (2) the plaintiff failed to

14 use reasonable diligence in seeking alternative employment. *EEOC v.*

15 *Farmer Bros. Co.,* 31 F.3d 891, 906 (9th Cir. 1994) (citations omitted).

16 Defendant bears the burden of demonstrating that the plaintiff failed to

17 mitigate damages. *Id.*

18    Here, Plaintiff resigned from Defendant's employ on August 15, 2005.

19 (Ct. Rec. 43 at 9.)  Over the next three (3) months, she applied for

20 several jobs without success.  Unable to find work, Plaintiff decided to

21 stop looking and start a family.

22    To meet its burden, Defendant must satisfy *both* prongs of the two-

23 part test set forth above. *Aguinaga v. United Food & Commercial Workers*

24 *Int'l Union,* 993 F.2d 1463, 1474 (10th Cir. 1993).  Defendant presented

25 no evidence to satisfy the first prong, i.e., that there were

26 substantially equivalent jobs available that Plaintiff could have

1  obtained.    Instead, Defendant emphasizes that Plaintiff failed to use
2  reasonable  diligence  in  seeking  alternative  employment  because  she
3  voluntarily withdrew from the labor market to care for her expected
4  child.[6]   This may be true.   But without satisfying the first prong,
5  evidence that Defendant meets the second prong is unhelpful.   *Aguinaga,*
6  993 F.2d at 1474.

7                              **III. Conclusion**

8       Accordingly, **IT IS HEREBY ORDERED:** Defendant's Motion for Summary
9  Judgment **(Ct. Rec. 25)** is **DENIED.**

10      **IT IS SO ORDERED.**   The District Court Executive is directed to enter
11  Order and provide copies to counsel.

12      **DATED** this  ___4th___  day of August 2008.

13

14            _____
                      S/ Edward F. Shea
15                    EDWARD F. SHEA
              United States District Judge
16  Q:\Civil\2006\3075.MSJ.wpd

17

18

19

20

21  _____

22       [6]*See Thorne,* 802 F.2d at 1135 n.3 (noting that a court properly
23  denies back pay when the plaintiff: (1) fails to remain in the labor
24  market, (2) refuses to accept substantially equivalent employment, (3)
25  fails to diligently search for alternative work, or (4) voluntarily quits
26  alternative work without good reason).

ORDER ~ 15